UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTHA D ENGLAND et al.,

      Plaintiffs,

v.

DENSO INTERNATIONAL AMERICA, INC.
et al.,

      Defendants.

_____/

Case No. 22-11129

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS (Dkt. 18)**

This matter is before the Court on Defendants' motion to dismiss (Dkt. 18). For the reasons that follow, the Court grants the motion.[1]

**I. BACKGROUND**

Plaintiffs are current and former employees of DENSO International America, Inc. (DENSO), a U.S. subsidiary of a global manufacturer of automotive components. 2d Am. Compl. ¶¶ 20–24 (Dkt. 6). They are participants in a 401(k) defined contribution plan sponsored and provided by DENSO. Id. ¶¶ 5; 33–34. The plan is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Id. ¶ 38. Seeking to represent a class of similarly situated DENSO employees who are covered by the plan, Plaintiffs bring this action under ERISA against

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiffs' response (Dkt. 19), Defendants' reply (Dkt. 23), and notices of supplemental authorities and responses to those notices filed by Plaintiffs and Defendants (Dkts. 24–38).

DENSO, its president, its board of directors, the DENSO National Retirement Committee, and individual members of that committee. Id. All Defendants are fiduciaries of the plan. Id. ¶ 5. The plan administrators are members of the DENSO National Retirement Committee, whom DENSO appoints to manage "day-to-day administration and operation of the Plan." Id. ¶ 36. The committee and its members have "responsibility for the control, management and administration of the Plan." Id.

Plaintiffs bring claims for breach of the duty of prudence and breach of the duty to monitor. Id. ¶¶ 225–264. They base their breach of the duty of prudence claim on four separate breaches. Id. ¶¶ 225–250; Resp. at 14. They allege that Defendants (i) allowed the plan to pay excessive recordkeeping fees to the plan recordkeeper; (ii) retained a higher cost share class for one fund offered in the plan; (iii) selected and retained two funds with investment management fees higher than fees for similarly sized plans; and (iv) selected and retained an underperforming stable value fund in the plan. 2d Am. Compl. ¶¶ 225–250; Resp. at 14. Further, Plaintiffs allege that DENSO and its president failed to effectively monitor the committee members in regard to their decisions about recordkeeping fees, investment management fees, and the performance of the stable value fund. 2d Am. Compl. ¶¶ 251–264.

## II. ANALYSIS[2]

Defendants seek dismissal of all of Plaintiffs' claims. The Court addresses each claim in turn. It finds that Defendants are entitled to dismissal of the breach of the duty of prudence claim

---

[2] To survive a motion to dismiss, a plaintiff must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. Id.

because Plaintiffs have not alleged sufficient facts from which the Court could plausibly infer that Defendants (i) paid recordkeeping fees that were excessive relative to the services rendered or (ii) made imprudent investment decisions based on the circumstances that existed at the time Defendants acted. Because Plaintiffs have failed to state plausible claims for breach of fiduciary duty, the claim for breach of the duty to monitor is also subject to dismissal.

### A. Breach of the Duty of Prudence Claims

"ERISA protects participants in employee benefit plans, including retirement plans, by establishing standards of conduct for plan fiduciaries." Forman v. TriHealth, Inc., 40 F.4th 443, 447 (6th Cir. 2022) (citing 29 U.S.C. § 1001(b)). A fiduciary must fulfill his or her duty "with the care, skill, prudence, and diligence" that a professional "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1)(B). "The duty of prudence requires plan administrators to select initial investment options with care, to monitor plan investments, and to remove imprudent ones." Forman, 40 F.4th at 448 (citing Tibble v. Edison Int'l, 575 U.S. 523, 528–529 (2015)). "The test for determining whether a fiduciary has satisfied his duty of prudence is whether the fiduciary, at the time [he or she] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Cassell v. Vanderbilt Univ., 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018). Thus, in assessing a plan administrator's prudence, "[t]he focus is on each administrator's real-time decision-making process, not on whether any one investment performed well in hindsight." Forman, 40 F.4th at 448.

The United States Supreme Court has explained that, because the content of the duty of prudence depends on the circumstances that exist at the time the fiduciary acts, the inquiry into whether plaintiffs have plausibly alleged a violation of the duty of prudence "will necessarily be

3

context specific." Hughes v. Northwestern Univ., 142 S. Ct. 737, 742 (2022) (punctuation modified). Moreover, at times "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." Id.

Plaintiffs allege that Defendants committed four separate breaches of the duty of prudence.

### 1. Excessive Recordkeeping Fees

Plaintiffs allege that Defendants breached their fiduciary duty of prudence to plan participants by failing to ensure that the plan's recordkeeping fees were objectively reasonable. 2d Am. Compl. ¶ 230.[3] They assert that Defendants required the plan to pay excessive recordkeeping fees and failed to remove the high-cost recordkeeper, Empower. Id. ¶ 6.

To allege a breach of fiduciary duty claim based on imprudent recordkeeping fees, a plaintiff must plead facts that would allow a plausible inference that the recordkeeping fees were excessive relative to the services rendered. Smith v. CommonSpirit Health, 37 F.4th 1160, 1164 (6th Cir. 2022).[4] In CommonSpirit, the plaintiff alleged that the recordkeeping fees for her plan were too high, and, for support, compared the cost of recordkeeping services per plan participant for her plan to the industry average. 37 F.4th at 1169. The Sixth Circuit affirmed dismissal of the claim,

---

[3] Plaintiffs' claim for excessive recordkeeping fees challenges recordkeeping and administrative (RKA) fees, which they define as "essential recordkeeping and related administrative . . . services." 2d Am. Compl. ¶ 48.

[4] Plaintiffs argue that CommonSpirit does not apply because the case involved the difference between passive and active funds, rather than recordkeeping fees. Resp. at 15. The plaintiff in CommonSpirit did allege that the retirement plan should have replaced actively managed mutual funds with passively managed mutual funds, but she also objected to the plan's recordkeeping fees, and the Sixth Circuit found that the recordkeeping claim was subject to dismissal. See 37 F.4th at 1169. Numerous courts have applied CommonSpirit to determine whether a plaintiff has stated a plausible claim for breach of the duty of prudence based on allegedly excessive recordkeeping fees. See, e.g., Albert v. Oshkosh Corp., 47 F.4th 570, 580 (7th Cir. 2022); Matousek v. MidAmerican Energy Co., 51 F.4th 274, 280 (8th Cir. 2022).

4

stating that the plaintiff "failed 'to allege that the fees were excessive relative to the services rendered'" and "'allege[d] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances.'" Id. (quoting Young v. Gen. Motors Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2d Cir. 2009)). The plaintiff did not plead that the services that her plan's fees covered were equivalent to those provided by the plans that made up the industry average. Id. For instance, she compared the plan's fees to "some of the smallest plans on the market, which might offer fewer services and tools to plan participants." Id. The Court found that those pleaded facts were insufficient to create an inference that the plan administrators were imprudent to choose recordkeeping fees of a particular amount. Id.

Defendants argue that Plaintiffs' allegations are insufficient under CommonSpirit and subsequent cases applying it because they fail to explain how Empower's fees were excessive under the circumstances. Mot. at 8–13. According to Defendants, to allege facts "relevant to determining whether a fee is excessive under the circumstances," an ERISA plaintiff must offer specific details about the nature and scope of the services that the recordkeeper provided, and Plaintiffs offer no specifics about the services that the DENSO plan or any comparator plan received in exchange for the fees they paid. Id. (quoting CommonSpirit, 37 F.4th at 1169). They contend that Plaintiffs try to circumvent this pleading requirement through "blanket allegations" that all mega plans purchase the same menu of recordkeeping services and that Empower does not appear to have provided any unusual services to justify the higher fees. Id. at 10–11. These allegations, they assert, are unaccompanied by any factual support indicating that the fees were excessive relative to the services they covered. Id.

Plaintiffs plead that the DENSO plan's recordkeeping fees "were objectively unreasonable and excessive when compared with other comparable 401(k) and 403(b) plans offered by other

5

sponsors that had similar numbers of plan participants." 2d Am. Compl. ¶ 81. The recordkeeping fees were excessive "relative to the level and quality of record-keeping services received since the same level and quality of services are generally offered to mega plans, like the DENSO Plan, regardless of the number or level of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500." Id. ¶ 82. The complaint describes some of the services offered by recordkeepers and states that for "mega plans"—meaning plans with over $500 million dollars in assets, like the DENSO plan—"any minor variations in the level and quality of RKA services . . . provided by recordkeepers ha[ve] little to no material impact on the fees charged by recordkeepers." Id. ¶¶ 32, 49, 52. Plaintiffs maintain that the 5500 forms and 404(a)(5) participant disclosures show that Empower "did not provide any services at any higher level that were not also part of the standard package of RKA services provided by all recordkeepers to mega plans." Id. ¶ 83.

For support, Plaintiffs compare the DENSO plan's average RKA fee per participant from 2016–2020 to "annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services." Id. ¶ 103. Plaintiffs present a table with the RKA fee per participant for 15 comparable plans, which comes from publicly available information from 2018 form 5500s (or the most recent year if 2018 was not available). Id. Based on the comparable plans, Plaintiffs allege that a prudent plan fiduciary would have paid on average an effective annual RKA fee of around $32 per participant, but the DENSO plan paid an average of $71 per participant. Id. ¶¶ 111–112.

Courts have characterized as conclusory the same allegations that Plaintiffs rely on to support their claim—that mega plans receive nearly identical recordkeeping services and that any difference in services is immaterial to the price of those services—and they have found that these

6

allegations are insufficient to permit the Court to infer that particular recordkeeping fees were excessive compared to the services rendered.[5] The same reasoning applies here. Plaintiffs do not

---

[5] See Miller v. Packaging Corp. of Am., Inc., No. 22-cv-271, 2023 WL 2705818, at *6 (W.D. Mich. March 30, 2023) (granting motion to dismiss in case in which plaintiff alleged that comparable recordkeepers identified in table provided "a similar level and quality of services," that recordkeepers servicing mega plans all offer the same bundle of essential services, and that any "minor variations in the level and quality" of these services "has little to no material impact on the fees charged by recordkeeper"—but where plaintiff "provide[d] no facts to support his contention that the RKA services provided to mega plans are generally the same, or that the recordkeepers in his chart provided essentially the same services as [the plaintiff's plan]; stating that plaintiff "fail[ed] to allege a factual basis for inferring that the RKA fees in his chart reflect the total charge for the RKA services provided to those plans"); Sigetich v. Kroger Co., No. 21-cv-697, 2023 WL 2431667, at *9 (S.D. Ohio March 9, 2023) (finding that allegation that there were "two types of essential RK&A services provided by all recordkeepers" and that "[f]or mega plans, like the Kroger Plan, any minor variations in the level and quality of RK&A services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers" were "wholly conclusory" and "fail[ed] to give any context to the services rendered to the Kroger Plan or to the services rendered to her comparable plans which may lead to the inference that the Kroger Plan's recordkeeping fees were excessive relative to the services rendered."); Probst v. Eli Lilly and Co., No. 22-cv-01106, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) ("[Caselaw, including CommonSpirit] requires that a plaintiff set forth allegations showing that the recordkeeping fees were excessive relative to the services rendered . . . and [plaintiff's] attempt to satisfy that directive was to allege that all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services. These allegations are wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan."); Singh v. Deloitte LLP, No. 21-cv-8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (finding that allegation that "[n]early all recordkeepers in the marketplace offer the same range of services" did not provide requisite amount of specificity to support breach of the duty of prudence claim); Guyes v. Nestle USA, Inc., No. 20-cv-1560, 2022 WL 18106384, at *4 (E.D. Wis. Nov. 21, 2022) ("The complaint alleges in conclusory fashion that the recordkeeping fees were excessive relative to the recordkeeping services received . . . [and] alleges that the defendants received a standard package of [recordkeeping] services. Crucially, however, the complaint does not contain any allegations concerning the specific services performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan paid more for equivalent services. Absent that context, the court is left with only a naked fee-to-fee comparison, which does not permit a reasonable inference that the defendants' process of managing the plan's recordkeeping fees was imprudent) (citing CommonSpirit, 37 F.4th at 1169)); Laabs v. Faith Tech., Inc., No. 20-cv-1534, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022) (stating that conclusory allegations that recordkeeping fees were excessive relative to the services rendered and that the defendant's plan "received a standard package of [recordkeeping] services" did not state a claim for breach of the duty of prudence); Mator v. Wesco Dist., Inc., No. 21-cv-00403, 2022 WL 3566108, at *4-5 (W.D. Pa. Aug. 18, 2022) (granting motion to dismiss when plaintiffs provided a chart using information

7

set forth facts to support the contention that the RKA services provided to mega plans are generally the same or that, for the 15 comparator plans in the chart, the recordkeepers provided essentially the same services as Empower provided to the DENSO plan. The complaint provides no details regarding the specific types or quality of services that the comparator plans received relative to the DENSO plan.

And the form 5550s on which Plaintiffs rely also do not provide information from which the Court could plausibly infer that the recordkeeping fee charged by the other recordkeepers covered the same services as the DENSO plan. In fact, the form 5500s show variations in reported services for the comparable plans.[6] See Bausch Health Companies, Inc. RSP Form 5500 (Dkt. 16-8); Childrens Medical Center of Dallas Employee Savings Plan Form 5500 (Dkt. 16-9); Ralph Lauren Corporation 401(k) Plan Form 5500 (Dkt. 16-10); Vibra Healthcare Retirement Plan form 550 (Dkt. 16-11); Dollar General Corp 401(k) Savings and Retirement Plan Form 5500 (Dkt. 16-12); Pilgrims Pride Retirement Savings Plan Form 5500 (Dkt. 16-13); JBS 401(k) Savings Plan Form 5500 (Dkt. 16-14). The variations suggest that "the particular services provided by the recordkeepers were not all the same; rather, they varied by type and/or quantity." Miller, 2023 WL 2705818, at *5; see also Sigetich, 2023 WL 2431667, at *9 (stating that "the differences in

---

disclosed in form 5500s to calculate the RKA fee per participant for other retirement plans and alleged that the RKA services provided to other large plans were essentially identical in type and quality as the services provided to the plaintiffs' plan because plaintiffs "presented nothing beyond conclusory allegations regarding services with no particularity as to the quality of the services that the [plaintiffs] received"; noting that permitting "bare allegations regarding the difference in recordkeeping fees and conclusory allegations regarding corresponding services" to proceed to discovery and protracted litigation would be inconsistent with the Supreme Court's direction that courts apply "'careful, context-sensitive scrutiny of'" ERISA fiduciary-breach claims to weed out meritless claims) (quoting Hughes, 142 S. Ct. at 742)).

[6] The Court can take judicial notice of these forms without converting the motion to dismiss to a motion for summary judgment because the forms are public records that are mentioned in the complaint and are central to Plaintiffs' claims. See Miller, 2023 WL 2705818, at *5 n.3.

8

costs and the differences in services reported among the comparable plans suggest that even minor variations in services impact per participant recordkeeping fees"). And as Defendants note, see Mot. at 12, for seven of the fifteen comparator plans, the numbers in Plaintiffs' chart do not appear on the plans' 2018 Form 5500s.

Consequently, Plaintiffs "fai[l] to give any context to the services rendered to the [DENSO] Plan or to the services rendered to [their] comparable plans which may lead to the inference that the [DENSO] Plan's recordkeeping fees were excessive relative to the services rendered." Sigetich, 2023 WL 2431667, at *9. The complaint, therefore, fails to provide the context-specific comparison "that could move this claim from possibility to plausibility." CommonSpirit, 37 F.4th at 1169.

Further, this complaint is Plaintiffs' second amended complaint. If Plaintiffs had facts to support their allegation that the comparator plans received a similar level and quality of services as the DENSO plan, but for a lower recordkeeping fee, they have had multiple opportunities to present them.

Even if variations in services have no material impact on recordkeeping fees, Plaintiffs' comparable plans do not match the DENSO plan relative to the number of participants or asset sizes.[7] From 2016–2020, the DENSO plan had an average of 12,272 plan participants and $1.4 billion in assets. 2d Am. Compl. ¶ 103. But the number of participants in the comparator plans

---

[7] Another issue with Plaintiffs' basis of comparison is that they compare the DENSO plan's average RKA fee per participant over a period of four years (2016–2020) to the 15 comparator plans' RKA fee per participant in a single year (2018 or the most recent year if the 2018 information is not available). See Jones v. Dish Network Corp., No. 22-cv-00167, 2023 WL 2796943, at *9 (D. Colo. Jan. 31, 2023) (explaining that because "[p]laintiffs compare the average fee paid by the Plan over a five-year span to the fees paid by the comparator plans for just one selected year," the comparison "is not the 'apples-to-apples' comparison that Plaintiffs allege it is" or that "suffices for a Court to infer that a fee is excessive").

9

range from 8,902 to 19,420, and the assets range from $107,652,510 to $1.3 billion. Five of the plans have fewer than 10,000 participants. Ten of the plans have less than $500 million in assets. Thus, as Defendants note, see Reply at 4–5, the comparator plans vary greatly in terms of the number of participants and the amount of assets held.

The differences between the comparator plans and the DENSO plan "raise serious doubt as to the plausibility of how the purported comparator plans are indeed comparable." Mator, 2022 WL 3566108, at *8 (dismissing breach of the duty of prudence claim based on similar comparator chart); see also Sigetich, 2023 WL 2431667, at *10 ("These differences in size call into question Plaintiff's comparable plans and whether the Kroger Plan's recordkeeping fees were excessive relative the services rendered."); Probst, 2023 WL 1782611, at *11 ("[T]he Comparator Table shows that the comparator plans are not all similar in size to the Plan, nor do they have similar assets . . . These differences call into question [plaintiff's] characterization of the comparator plans as being of similar sizes with similar amounts of money under management.").

Plaintiffs present conclusory allegations regarding the similarity in services for mega plans, no facts concerning the actual services that the fees for the DENSO plan or the 15 comparator plans covered, and comparator plans that differ in number of participants and asset sizes. Therefore, they do not set forth facts "relevant to determining whether a fee is excessive under the circumstances." CommonSpirit, 37 F.4th at 1169. The Court cannot draw a plausible inference of imprudence on the recordkeeping claim, and Defendants are entitled to dismissal of the claim.

2. **Higher Cost Share Class Fund**

Next, Plaintiffs allege that Defendants breached the duty of prudence by retaining a higher cost share class for one fund offered in the plan, the Goldman Sachs Small Cap Value Fund. 2d Am. Compl. ¶¶ 7, 145. According to Plaintiffs, Defendants "did not engage in an objectively reasonable

search for and selection of the share classes that provide the lowest net expense ratio." Id. ¶ 144. The net expense ratio is the total expense ratio minus the revenue sharing that is rebated to participants. Id. ¶ 78. The lowest net expense ratio provides the greatest benefit to plan participants. Id. ¶ 143.

Plaintiffs allege that Defendants should have purchased higher-cost share classes that offer greater revenue sharing and that, when accounting for this revenue sharing, make the net expense ratio lower. Id. ¶¶ 145, 174. They focus specifically on the "R6" share class of the Goldman Sachs Small Cap Value Fund, which is one of the plan's investments. Id. ¶ 145. The net expense ratio of the R6 share class was 0.95%. Id. Plaintiffs state that the fund managers offered the same fund in a different share class. Id. The expense ratio for this allegedly prudent alterative share class was more expensive (1.03%). Id. But the revenue sharing credit was 0.30%, which made the net expensive ratio 0.73%. Id. Plaintiffs allege that it was imprudent for Defendants not to select the share class with the lowest net expense ratio. Id. ¶ 165. They maintain that these two share classes offered identical portfolio management services and that "[w]hen two identical service options are readily available . . . a prudent plan fiduciary ensures that the least expensive of those options is selected." Id. ¶¶ 148, 160.

As Defendants point out, courts have rejected Plaintiffs' net expense ratio theory. See Albert, 47 F.4th at 580–581; Peck v. Munson Healthcare, No. 22-cv-294, 2022 WL 17260807, at *7 (W.D. Mich. Nov. 9, 2022); Nohara v. Prevea Clinic Inc., No. 20-cv-1079, 2022 WL 16927810, at *4 (E.D. Wis. Oct. 27, 2022). For example, in Albert, the plaintiff contended that his plan should have offered higher-cost share classes of certain mutual funds because the net expense of those funds would be lower in light of revenue sharing. 47 F.4th at 581. The plaintiff asserted that the key indication of whether investment fees were prudent was the net expense ratio and, like the

11

Plaintiffs here, that "[w]hen two identical service options are readily available . . . a prudent Plan Fiduciary ensures that the least expensive of those options is selected." Id.

The court noted that the claim was "the inverse of what ERISA plaintiffs typically argue," which is that a plan should have offered cheaper institutional share classes instead of more expensive retail share classes. Id. In contrast to the typical approach, the plaintiff took issue with the plan offering cheaper institutional share classes of investments, rather than more expensive retail share classes, like the Plaintiffs do here. Id. The court determined that the complaint did not allege sufficient facts to make this "novel theory" plausible, and it stated that it could not find—and the plaintiff did not cite—"any court decisions crediting this theory." Id. While a prudent fiduciary might consider the net expense ratio, the court stated, "no court has said that ERISA requires a fiduciary to choose investment options on this basis." Id.

The court also rejected the plaintiff's claim for another reason. The court explained that "[s]ome revenue sharing proceeds go to the recordkeeper in the form of profits, and some go back to the investor, but there is not necessarily a one-to-one correlation such that revenue sharing always redounds to investors' benefit." Id. However, the Plaintiff's "net investment expense to retirement plans theory" assumed that there was such a correlation. Id. The court stated that "if that assumption is wrong, then simply subtracting revenue sharing from the investment-management expense ratio does not equal the net fee that plan participants actually pay for investment management." Id.

Other courts have followed Albert in finding that claims based on the net expense ratio theory are not plausible. See Peck, 2022 WL 17260807, at *7 (noting that, like the plaintiff in Albert, the plaintiff did not cite any case that supported this theory and stating that "[i]f the Court allowed this inverted claim to proceed, fiduciaries would be put in an impossible position, penalizing them for

12

acting as plaintiffs repeatedly argue they should act and forcing them to use revenue sharing, which this Court and the Sixth Circuit caution against") (punctuation modified); Nohara, 2022 WL 16927810, at *4 ("Because Albert confirmed that a fiduciary need not purchase share classes based on the lowest net cost, there are no facts under which a claim for relief could be plausible.").

Plaintiffs in this case present the same argument as the unsuccessful plaintiffs in Albert and subsequent cases relying on Albert: that the plan should have purchased higher-cost share classes of certain funds that had greater revenue sharing credit, which would offset that higher cost to make the net expense lower. The Court agrees with the court in Albert that, because a prudent ERISA fiduciary might choose an investment option based on revenue sharing but is not required to do so, and because there is not necessarily a one-to-one correlation such that revenue sharing always redounds to investors' benefit, Plaintiffs have not set forth sufficient facts to make their claim plausible.

Plaintiffs do not provide a sufficient basis for distinguishing their claim from the claims at issue in the Albert line of cases. They contend that the Sixth Circuit recognized their net expense ratio theory in Forman and that there is a factual dispute over whether a prudent fiduciary should select the share class with the lowest net expense ratio or the lowest total expense ratio, which cannot be resolved on a motion to dismiss. Resp. at 18–20 (citing Forman, 40 F.4th at 449). But Plaintiffs' share-class claim is the opposite of the claim that survived the motion to dismiss in Forman. In that case, the plaintiffs alleged that "TriHealth violated the duty of prudence by offering them pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds to other retirement plans." Forman, 40 F.4th at 450. The Sixth Circuit found that the plaintiffs sufficiently alleged that the pension plan was large enough to qualify for the lower cost institutional shares and that the

13

defendant failed to offer these discounted shares. Id. at 453. Therefore, the allegations permitted the reasonable inference that plan administrators were imprudent in failing to select the less expensive share class. Id. Unlike the plaintiffs in Forman, Plaintiffs here allege that it was imprudent for Defendants to select a less expensive share class for one of the funds in the plan and that Defendants should have offered a more expensive share class to take advantage of potential revenue sharing. Forman does not credit Plaintiffs' theory. See Peck, 2022 WL 17260807, at *7 (distinguishing the claims in Forman from claims based on the net expense ratio theory and finding that Forman supported dismissal of claims based on the net expense ratio theory).

Defendants are entitled to dismissal of Plaintiffs' breach of the duty of prudence claim to the extent the claim is based on retaining a higher cost share class for the Goldman Sachs Small Cap Value Fund.

### 3. Funds with Higher Investment Management Fees

Plaintiffs allege that Defendants offered two funds with investment management fees that were higher than "comparable actively managed, alternative funds in the same investment style." 2d Am. Compl. ¶ 174.

First, they focus again on the R6 share class of the Goldman Sachs Small Cap Value Fund (with an expense ratio of 0.95% and no revenue sharing for a net expense ratio of 0.95%) and allege that the "prudent alternative" was the MassMutual Small Cap R5 Fund (with an expense ratio of 0.75% and 0.15% revenue sharing for a total net expense ratio of 0.60%). Id.

Second, they challenge the DENSO plan's Boston Partners Large Cap Value Equity Fund (with an expense ratio of 0.42% and no revenue sharing for a net expense ratio of 0.42%) and allege that the "prudent alternative" was the Vanguard Equity Income Admiral Shares Fund (with an expense ratio of 0.19% and no revenue sharing for a net expense ratio of 0.19%). Id.

They assert that the two investment options offered in the DENSO plan were 89.69% more expensive than the "prudent alternative and less expensive options covering the same asset category and same investment approach." Id. ¶ 176. They allege, therefore, that Defendants were imprudent in failing to "consider the materially similar but cheaper alternatives to the Plan's investment options," which a reasonable investigation would have revealed. Id. ¶ 182.

Defendants argue that this claim should be dismissed because the complaint does not plead a meaningful benchmark, and, even if the comparators were of the same investment style, simply picking a few funds of the same investment style with lower expense ratios, without more factual content, does not establish a claim of prudence. Mot. at 19–22; Reply at 6–8.

The Sixth Circuit has explained that "[p]lan administrators . . . have considerable discretion in choosing their offerings and do not have to pick the lowest-cost fund of a certain type where the long-run performance of another fund had the reasonable prospect of surpassing it." Forman, 40 F.4th at 449. It has, therefore, emphasized the importance of "a sound basis for comparison in imprudence claims." Id. "Disappointing performance in the near term and higher costs do not by themselves show deficient decision-making, especially when we account for competing explanations and other common sense aspects of long-term investments." Id. Thus, "[t]o make a meaningful comparison between the fund offered by the Plan and an alternative option," an ERISA plaintiff "must account for, among other things, the distinct goals and distinct strategies of various investment options." Miller, 2023 WL 2705818, at *9.

For example, in Forman, the plaintiffs brought a claim for breach of the duty of prudence based on their allegations that the performance of several funds in a plan was deficient at certain points and that the overall fees charged for the investment options were too high. 40 F.4th at 446. For several of the funds, they identified "available alternatives in the same investment style" that

15

charged lower fees and performed better over a three-year period. Id. at 449. But the plaintiffs did not "plausibly plead that these available alternatives were otherwise equivalent to the selected funds." Id. at 449. Given that higher costs or differences in short-term performance alone do not indicate deficient decision-making, the court found that these allegations did not create an inference that plan administrators were imprudent for selecting the funds in the plan, even if cheaper funds appeared in the market. Id.

Plaintiffs have not stated a plausible claim that Defendants were imprudent by failing to consider and select lower-cost alternatives. As in Forman, they compare the investment management fees for two funds in the plan to "available alternatives in the same investment style" that charged lower fees. 2d Am. Compl. ¶ 174. They do not set forth facts related to the distinct goals and distinct strategies of the investment options or offer any content that indicates that the available alternatives were otherwise equivalent to the selected funds. They do not present facts on the different aims, risks, or potential rewards of the funds and the alternatives. And unlike in Forman, Plaintiffs offer no allegations about the performance of the alternatives. They do not allege that either fund in the plan underperformed its benchmark or that the allegedly prudent alternatives performed better. They have, therefore, not provided a sound basis for comparison. Plaintiffs have pointed only to alternative funds with lower costs that existed during the class period, but higher costs alone do not raise the inference that Defendants were imprudent by selecting or retaining the two allegedly higher-cost funds. See Forman, 40 F.4th at 449; Smith, 37 F.4th at 1166–1167; PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 718–719 (2d Cir. 2013) (explaining that to allege a breach of prudence claim, it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions").

16

In arguing that they have sufficiently alleged that Defendants imprudently retained high-cost funds when more reasonable alternatives were available, Plaintiffs rely on Parker v. GKN N. Am. Servs., No. 21-12468, 2022 WL 3702072 (E.D. Mich. Aug. 26, 2022). But in that case, the plaintiffs (i) alleged that defendants' fiduciary process "resulted in a portfolio dominated by . . . high-cost, actively managed funds that performed poorly in comparison to cheaper alternatives," (ii) alleged that their selected comparator funds "were significantly cheaper and consistently outperformed the Plan funds," and (iii) presented selected comparator funds that were all within the same Morningstar categories, which "function[ed] as comparators in areas that include the potential risks and rewards of the fund." 2022 WL 3702072, at *4. Plaintiffs here, conversely, set forth no facts on the performance of the comparator funds or the potential risks and rewards of the funds.

Defendants are entitled to dismissal of Plaintiffs' breach of the duty of prudence claim to the extent the claim is based on Defendants allegedly selecting and retaining two funds with investment management fees in excess of fees for similarly sized plans.

4. **Underperforming Stable Value Fund**

Plaintiffs' final claim for breach of the duty of prudence focuses on one allegedly underperforming stable value fund. 2d Am. Compl. ¶¶ 188–211.[8] They allege that, in 2020, Defendants permitted the DENSO plan to move from a properly performing stable value fund, the Mass Mutual Separate Account Guaranteed Investment Contract (SAGIC) II Fund, to an underperforming stable value fund, the Denso Stable Value Fund. Id. ¶¶ 86, 194. The DENSO

---

[8] A stable value fund in a retirement plan "is (i) similar to a money market fund in that it provides liquidity and principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time." 2d Am. Compl. ¶ 190. However, "[i]t differs from both in that it seeks to generate returns greater than a money market and equivalent to a short—to intermediate—term bond fund. Id. Stable value funds have an insurance component. Id. ¶ 189.

Stable Value Fund was more expensive than the Mass Mutual SAGIC II fund and "consistently charged DENSO Plan participants on average 93 basis points more and, consequently, returned 93 basis points less." Id. ¶ 197. While the Mass Mutual SAGIC II fund outperformed its benchmark (the Morningstar Stable Value Index) from 2017–2019, the Denso Stable Value Fund underperformed its benchmark in 2020 and 2021. Id. ¶¶ 195–196. Plaintiffs allege that Defendants were imprudent in moving to the Denso Stable Value Fund and in failing to remove the fund from the plan once it was evident that the fund was underperforming the Mass Mutual SAGIC II fund and the benchmark. Id. ¶¶ 202, 210.

The Sixth Circuit has explained that "a showing of imprudence [does not] come down to simply pointing to a fund with better performance." Smith, 37 F.4th at 1166. While pointing to another fund the plan might have invested in is often necessary to show that fund acted imprudently, that factual allegation is alone insufficient. Id. "Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry— that breaches a fiduciary duty." Id.; see also Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset."). If that were sufficient, "every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation." Id. Further, "[a] side-by-side comparison of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option," id., especially given that "[d]ifferent services, investment strategies, and investor preferences invariably lead to a spectrum of options—and in turn a spectrum of reasonable

18

fee structures and performance outcomes." Forman, 40 F.4th at 443. Claims for breach of the duty of prudence "require evidence that an investment was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance." Id.

Here, as Defendants note, Plaintiffs focus only on the first two years of performance for a fund that is supposed to grow for several decades. They set forth only an after-the-fact performance gap between a benchmark comparator within a narrow window of time. The two-year snapshot of underperformance is insufficient to plausibly plead that the investment should never have been selected, became imprudent over time, or was otherwise unsuitable for the goals of the fund. See Smith, 37 F.4th at 1166 (affirming dismissal of claim based on similar comparison of isolated performance in which plaintiff alleged that plan administrators imprudently retained funds when those funds trailed their benchmark by 0.63 percentage points over a five-year period and noting that, while a fund's underperformance may help support a claim of imprudence, that alone does not suffice, "especially if the different performance rates between the funds may be explained by a different investment strategy"). The Court dismisses Plaintiffs' breach of the duty of prudence claim to the extent the claim is based on the alleged underperformance of the Denso Stable Value Fund.

### B. Breach of the Duty to Monitor Claims

Plaintiffs allege that DENSO and its president breached its duty to monitor other fiduciaries who were responsible for overseeing the Plan's recordkeeping fees, investment management fees, and performance of the DENSO Stable Value Fund. 2d Am. Compl. ¶¶ 251–264.

"Because a claim that certain Defendants failed to monitor the imprudent or disloyal actions of others requires a preliminary finding of breach of those duties, courts generally treat a 'failure

19

to monitor' claim as rising or falling with a breach of duty claim." Dover v. Yanfeng US Auto. Interior Sys. I LLC, 563 F. Supp. 3d 678, 690 (E.D. Mich. 2021); see also Parker v. GKN N. Am. Servs, No. 21-12468, 2022 WL 3702072, at *6 (E.D. Mich. Aug. 26, 2022) ("[U]nlike the fiduciary duties of prudence and loyalty, most courts treat a duty to monitor claim as deriving from a successful claim of a breach of fiduciary duty."). Plaintiffs have failed to state plausible claims for breach of the duty of prudence, and, therefore, the Court dismisses their claims for breach of the duty to monitor. See Miller, 2023 WL 2705818, at *12 (dismissing claim that defendants failed to monitor plan administrators when plaintiff failed to state a claim that defendants breached their fiduciary duty by paying excessive recordkeeping fees and excessive fees for managed account services).

### III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss (Dkt. 18).

SO ORDERED.

Dated: July 28, 2023  
Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge